PRYOR *v.* PRYOR

[No. 406, September Term, 1964.]

*Decided October 20, 1965.*

*Lewis L. Fleury,* with whom was *Harry M. Sachs, Jr.* on the brief, for appellant.

No brief and no appearance for appellee.

BARNES, J., delivered the opinion of the Court.

The appellant, Louvain Pryor (Wife No. 1) was married to Warwick N. Pryor (husband) on December 25, 1939. The husband filed a bill of complaint against Wife No. 1 in the Circuit Court of Baltimore City on April 15, 1946 in which he

alleged the marriage of the parties; that he had been a resident of Baltimore City for more than one year next preceding the filing of the bill of complaint; that Wife No. 1 was a nonresident of Maryland and the usual allegations of abandonment by Wife No. 1. He prayed for a divorce *a vinculo matrimonii,* other relief and for an order of publication to be served personally on Wife No. 1 at 545 West 141st Street, New York, N. Y.

On June 25, 1946, a certificate, duly verified, of Hamilcar B. Hannibal, as the server of process, was filed in the divorce suit indicating that Mr. Hannibal had received the order of publication in the suit and on April 20, 1946, took the order of publication to 545 West 141st Street, New York City, N. Y. where the defendant (Wife No. 1) resided and after informing her of the nature and object of the action, left the order of publication with the defendant and that "he did then and there make personal service on the defendant."

Wife No. 1 not having answered, a decree *pro confesso* was entered on June 3, 1946 and the suit was referred to one of the Examiners to take testimony to support the allegations of the bill of complaint.

Testimony was taken before an Examiner on June 25, 1946 and filed on July 3, 1946. The husband testified that he resided at 1104 Russell Street, Baltimore and was employed as a freight checker. He also testified that he was "a resident of Baltimore City and State of Maryland" and had been "for more than one year prior to the filing of this Bill."

The husband's testimony was corroborated by Atlas E. Barbee, Jr. (Barbee) who testified that he resided at 1104 Russell Street, Baltimore and that he was employed in the Baggage Department of the Pennsylvania Railroad Company. He further testified that the husband was a resident of Baltimore City and of the State of Maryland and that the husband had "been for more than one year prior to the filing of this suit."

A final decree was passed by the Circuit Court on July 16, 1946 as recommended by the report of the Master, divorcing the husband from Wife No. 1 *a vinculo matrimonii* and requiring the husband to pay the costs.

The husband one week after the signing and filing of the final decree married Sylvia Pryor (Wife No. 2) on July 23, 1946 in Baltimore, Maryland.

In February 1959, the husband was killed while employed by the New York Central Railroad Company allegedly as a result of the negligence of his employer and the United States of America. As the husband had been employed in interstate commerce, his widow is entitled to bring an action under the Federal Employees Liability Act against his employer and, as a result of his allegedly wrongful death, also is entitled to bring an action under the Federal Tort Claims Act and the New York wrongful death statute.

Almost 13 years after the divorce decree was signed and filed, Wife No. 1 filed a petition on July 9, 1959 in the Circuit Court to strike out the divorce decree. She alleged *inter alia* that she was not served with the process as certified in the proceedings, that neither the husband nor Wife No. 1 had ever been residents of Maryland, the husband during the year prior to filing the bill of complaint was a resident of New York City, employed by the Pennsylvania Railroad Company in the freight yards there and that he never resided at 1104 Russell Street, Baltimore, Maryland. She also alleged that Barbee was likewise a resident of New York City, was never a Maryland resident and was still residing in New York City. She set forth in her petition that these facts constitute a fraud on the court, and the decree is a mistake based upon false testimony and fraud, and for these reasons, should be stricken out. She prayed that the divorce decree be stricken out. She offered testimony tending to establish the allegations of her petition.

Judge Cardin, after hearing argument and considering the case filed a carefully considered opinion reviewing the facts and the applicable law. Judge Cardin found as a fact that Wife No. 1 had actual knowledge in 1946 that the husband had obtained a divorce from her in Baltimore. He concluded that her failure to take any action for 13 years to set the decree aside during which time Wife No. 2 had married the husband without knowing of any legal impediment to the validity of her marriage, and had lived with the husband as his wife for 13 years until his accidental death in 1959 (after which event the petition to set aside was filed) amounted to laches which required that the petition of Wife No. 1 to set the divorce decree aside be dismissed. An order dismissing the petition of Wife No. 1 was filed on Oc-

tober 26, 1964 and this appeal followed. We agree with Judge Cardin's conclusion and the order dismissing the petition of Wife No. 1 will be affirmed.

This Court has had before it a number of cases in which the defense of laches was asserted against the relief prayed for in bills of complaint or petitions to vacate final divorce decrees obtained in Maryland or in a sister State and entered after a decree *pro confesso* was first obtained. In those petitions or bills of complaint it was alleged that the trial court lacked jurisdiction over the subject matter because of fraud in connection with the residence requirements applicable to the plaintiff in the original divorce suit. In every decision, however, the Court has held that the factual situation necessary to support the defense of laches was not present, so that there is no holding that laches did apply although this has been strongly indicated. See *Day v. Day,* 237 Md. 229, 205 A. 2d 798 (1964) ; *Pelle v. Pelle,* 229 Md. 160, 182 A. 2d 37 (1961) ; *Connelly v. Connelly,* 190 Md. 79, 57 A. 2d 276 (1948) ; *Hinden v. Hinden,* 184 Md. 575, 42 A. 2d 120 (1945) ; *Croyle v. Croyle,* 184 Md. 126, 40 A. 2d 374 (1944) ; and *Simms v. Simms,* 178 Md. 350, 13 A. 2d 326 (1940). See also *Ewald v. Ewald,* 167 Md. 594, 175 Atl. 464 (1934) in which this Court reversed the trial court's finding in a subsequent annulment suit involving a later marriage that the prior divorce decree was null and void in a suit in which the wife was plaintiff and she allegedly was not a resident of Maryland when the decree *pro confesso* and the final divorce decree were obtained. Judge Urner, speaking for the Court, stated:

"The question with which we are concerned in this case is whether the decree of the Circuit Court, dissolving a Maryland marriage for a cause arising in Maryland, should be nullified because additional evidence, produced twelve years later, has convinced another chancellor that the decree was erroneous in its determination of the jurisdictional fact of residence. The record fails to present any reason which seems to us adequate for such a review and rescission of the decree thus challenged. It was passed by a court having the power and duty to decide as to the existence of its

jurisdiction over the case, and its unappealed decision of that question should not be subject to avoidance under such conditions as those which this case presents." (Page 597 of 167 Md., page 466 of 175 Atl.).

The weight of authority in the United States sustains the application of the defense of laches in suits involving attempts to set aside a divorce decree obtained by a spouse who lacked the necessary residence requirements which would give the divorce court jurisdiction as conferred by statute. See *Norris v. Norris,* 342 Mich. 83, 69 N. W. 2d 208 (1955), cert. den. 350 U. S. 903, 76 S. Ct. 182, 100 L. Ed. 793 (1956); *Cook v. Cook,* 167 Or. 474, 118 P. 2d 1070 (1941); *Morehouse v. Morehouse,* 111 S. W. 2d 831 (Tex. Civ. App. 1937); *Caffall v. Caffall,* 5 Utah 2d 407, 303 P. 2d 286 (1956); *Swift v. Swift,* 239 Ia. 62, 29 N. W. 2d 535 (1947). 17 Am. Jur. *Divorce and Separation,* § 513, page 609 (1957) and 27A C.J.S. *Divorce,* § 166c, pages 653-655 (1959). See also *Musgrove v. Musgrove,* 213 Ga. 610, 100 S. E. 2d 577 (1957) and *Attebery v. Attebery,* 172 Neb. 671, 111 N. W. 2d 553 (1961) where the defense of laches was applied even though the court lacked jurisdiction over the subject matter, but had in personam jurisdiction over both parties. On the subject generally, see Clark, *"Estoppel Against Jurisdictional Attack on Decrees of Divorce",* 70 Yale L.J. 45 (1960), Jacobs, *"Attack on Decrees of Divorce",* 34 Mich. L. Rev. 749 (1936) and Annotations; *"Divorce-Relief from Default Decree",* 22 A.L.R. 2d 1312 (1952); *"False allegations of plaintiffs' domicile or residence in the state as ground for vacation of default decree of divorce",* 6 A.L.R. 2d 596 (1949); *"Power of court, in absence of express authority, to grant relief from judgment by default in divorce action",* 157 A.L.R. 6, 60-70 (1945).

There is a strong public policy generally in sustaining the finality of judgments and decrees. This policy is of particular importance in regard to decrees divorcing parties *a vinculo matrimonii* as parties are remarried, have children and create new property interests in reliance upon the finality of such decrees. They must not lightly be set aside in view of the injurious consequences which would result to innocent persons. *Leatherbury v. Leatherbury,* 233 Md. 344, 196 A. 2d 883 (1964). As

is well stated in 3 NELSON, DIVORCE AND ANNUL-MENT, §28.23, page 167 (1945):

> "It is essential to the proper functioning of the courts that their adjudications attain unquestionable finality as early as possible after the period of general control of the court has passed. In view of this, the doctrine of laches is frequently invoked to bar the questioning of a divorce decree after any considerable period of time by one who has knowledge thereof but who failed to act with reasonable promptitude."

In *Croyle v. Croyle, supra,* Judge Melvin, speaking for the Court defined laches as follows:

> "The very heart of the doctrine of estoppel, through laches, is that the defendant's alleged change of position for the worse must have been induced by, or resulted from, the conduct, misrepresentation or silence of the plaintiff." (Page 136 of 184 Md.; page 379 of 40 A. 2d).

Although remarriage by the plaintiff in the divorce suit and the fact of the husband's death prior to the filing of the petition to strike out the divorce decree do not preclude the first wife from attacking the divorce decree as a fraud on the court (*Croyle v. Croyle, supra; Connelly v. Connelly, supra*), these are factors which may be given consideration as elements in considering the necessary prejudice resulting from the unwarranted delay for the application of laches in the particular case. A case quite similar to the case at bar in this regard is *Harris v. Harris,* 196 F. 2d 46 (D.C. Cir. 1952) involving a challenge to the validity of a Virginia divorce decree on the ground of insufficient residence in Virginia after 13 years of delay from the time the first wife learned of the divorce decree shortly after it was obtained, the plaintiff husband having married the second wife several months after obtaining the divorce decree and having died prior to the filing of the first wife's petition. In sustaining the trial court's dismissal of the first wife's petition on the ground of laches, Circuit Judge Fahy stated for the United States Court of Appeals for the District of Columbia:

"The facts justified the court's conclusion with respect to laches. The intervening death of decedent made it more difficult for appellee to defend the Virginia proceedings insofar as their validity turned upon the critical facts regarding decedent's residence or domicile. Further, decedent's will evidenced an understanding on his part that appellee would be provided for as his widow. Otherwise he might well have made other provision for her. These factors, coupled with the long lapse of time, are adequate support for the decision." (Page 47 of 196 F. 2d).

See also *McLaughlin v. McLaughlin,* 199 Pa. Super. 53, 184 A. 2d 130 (1962), and *Jannino v. Jannino,* 234 S. C. 352, 108 S. E. 2d 572 (1959). See also Annotation at 6 A.L.R. 2d 596, 621 (1949), *supra,* and 3 NELSON, DIVORCE AND ANNULMENT, §28.23, pages 167-168 (1945).

Even though Wife No. 2 married the husband shortly after the divorce decree was obtained, she continued to live with the husband for 13 years relying on that decree as establishing the validity of her marriage. Had she known of the present contention of Wife No. 1 within a reasonable time after the decree was obtained, Wife No. 2 would have had the opportunity to have determined whether, under these circumstances, she would have continued to live with the husband as husband and wife. In our opinion the continued silence and inactivity of Wife No. 1 prejudiced Wife No. 2.

The burden of proof in establishing lack of jurisdiction because of the absence of domicile is upon the person alleging it. *Epstein v. Epstein,* 193 Md. 164, 174, 66 A. 2d 381, 384 (1949). The proof of fraud must be clear and convincing. *Bachrach v. Washington United Cooperative, Inc.,* 181 Md. 315, 320, 29 A. 2d 822, 825 (1943).

The death of the husband prior to the filing of Wife No. 1's petition to strike the decree was prejudicial in that it removed a most important witness to the question of the husband's residence in Maryland. Although the evidence indicates that the husband's residence in Maryland was a "remote possibility," *it was possible* and the witness who could give important and ma-

 232

terial evidence is not available by reason of death. That witness would have been available for giving testimony had Wife No. 1 asserted her position within a reasonable time. The delay of 13 years with the loss of this material witness also supported the trial court's conclusion that the petition of Wife No. 1 should be dismissed because of laches. *Harris v. Harris, supra; Jannino v. Jannino, supra;* 3 NELSON, DIVORCE AND ANNULMENT, §28.24, page 170 (1945).

*Order affirmed, the appellant to pay the costs.*