# WOODDY *v.* WOODDY

[No. 172, September Term, 1969.]

*Decided January 9, 1970.*

442

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, and SMITH, JJ. and CHARLES E. ORTH, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*Edward J. Skeens* for appellant.

*Robert T. Barbour* for appellee.

BARNES, J., delivered the opinion of the Court.

The question presented by this appeal is whether or not the Chancellor (Dorsey, J.) erred in sustaining the demurrer of the appellee, Arthur Overton Wooddy, without leave to amend, to a bill of review filed on December 19, 1968, in the Circuit Court for Charles County (Equity No. 2152A) by the appellant, Louise Rossiter Wooddy, the former wife of the appellee, to declare null and void a decree for a divorce *a vinculo matrimonii*, dated October 18, 1966, upon the cross-bill of complaint filed by the appellee husband in a divorce suit filed by the appellant for a divorce *a vinculo matrimonii* on the ground of constructive desertion in the Circuit Court for Charles County (Equity No. 1548A) after a trial of the divorce suit on the merits and after the former husband had remarried in mid-October, 1968.

The bill for review, in relevant part, alleged the following: Preliminarily, it alleged that the plaintiff (the appellant, Louise Rossiter Wooddy, hereinafter referred to as Louise) in the verified Bill of Review brings the action "to vacate, set-aside and declare null and void, a

decree of divorce *a vinculo matrimonii*, pursuant to Rule 625, Maryland Rules of Procedure, upon grounds of fraud and irregularity, and in support thereof" represents as follows:

1. The parties were divorced *a vinculo matrimonii* by the decree of the Circuit Court for Charles County on October 18, 1966, upon the Cross-Bill of Complaint for divorce of the defendant (the appellee, Arthur Overton Wooddy, hereinafter referred to as Arthur) in Equity No. 1548A "after a contested trial upon the merits."

2. Louise alleges that she had been deprived of the assistance of counsel, not apparent from the record in the divorce case "constituting such fraud and irregularity giving this court revisory power and control" over the final decree as provided by Maryland Rule 625 due to the "malpractice, negligence, conflict of interest, and breach of professional ethics" of Louise's original counsel in the divorce suit, "upon the facts and circumstances following:"

(a) Louise's original counsel is a duly admitted member of the Maryland Bar, the Maryland State Bar Association, the bar of this Court, of the Circuit Court for Charles County and others; he is engaged in the general practice of law with offices in La Plata, Charles County.

(b) The original counsel was employed by Louise on February 10, 1965, as her attorney in a domestic relations dispute with her husband, Arthur, "concerning the subject of a divorce, alimony, custody and support of minor children, and a division of jointly owned real and personal property." This employment continued until terminated sometime after February 3, 1967. Louise paid her original counsel $2,000.00 for services rendered.

(c) Under the employment agreement, original counsel "owed plaintiff the duty of professional skill practiced in the field of law; the duty to disclose to the plaintiff of all circumstances of his relations to the parties; the duty to disclose any interest in or connection with the controversy; the duty to refrain in representation of

plaintiff in connection with the attorney's conflicting interests; and the duty to give undivided faith, fidelity and trust in all matters affecting the plaintiff's interests involving his retention as Counsel."

(d) Original counsel "did breach every above described duty owed to the plaintiff, as set forth below, thereby vitiating the divorce proceeding in its entirety."

(e) Original counsel should not have advised and counselled Louise "regarding the corporate and lease papers for rental of her joint interest in real estate," leased for a term of 50 years to the Maryland National Bank "while, at the same time or as a result thereof," original counsel "was a director, and/or officer and/or stockholder of the Maryland National Bank during a period when settlement negotiations with the attorney for plaintiff's husband had resulted in a stalemate, and within several weeks in which said divorce proceedings were filed."

(f) Original counsel should not have procured, without disclosure of any kind, Louise's signature as guarantor on a promissory note for $360,000 for the protection of the mortgagee, Suburban Trust Company, secured by that note "which benefited the husband's business interests" while at the same time original counsel was "a director, and/or officer and/or stockholder of the Suburban Trust Company and named as its attorney and agent in the mortgage instrument, and all procured within three (3) weeks before divorce proceedings were filed and a property settlement agreement had failed consummation with plaintiff's husband."

(g) Original counsel conducted an examination and title search among the land records of Charles County in regard to Louise's jointly held real estate while the divorce proceedings were pending and "erroneously and negligently advised" Louise that among other properties she would become sole owner of a one-fourth interest in the Jarwood Clinic properties, valued in excess of $200,000 "upon entry of a final decree of divorce to either, the plaintiff or her husband"; whereas in fact the divorce

decree terminated all interest of Louise in the Jarwood Clinic properties which remained titled in the name of Arthur, then unmarried, and J. Parran Jarboe by a fee-simple deed dated January 8, 1948, and duly recorded among the land records of Charles County in Liber P.C.M. 86, folio 228, et seq.

(h) Throughout the period of original counsel's employment Louise insisted that divorce proceedings be instituted against Arthur upon the ground of adultery, but original counsel, "contrary to the best interests of plaintiff, coerced and prevailed upon plaintiff to claim constructive desertion in lieu of adultery, although the parties were still living under the same roof, upon the following false and improper considerations: that plaintiff would be likely to obtain alimony for herself in either event; that plaintiff would obtain a division of an undivided half interest of all jointly-owned property, including the Jarwood Clinic properties, in either event; that plaintiff would obtain custody and support for her minor children in either event; that plaintiff had nothing to gain in either event, but that the Town of La Plata had a great deal to lose in the person of her husband's medical, professional and business stature, since her husband's good reputation in the community would be ruined; and that her husband would abscond beyond the jurisdiction of Maryland's Courts leaving the plaintiff without a relief or remedy."

(i) The Court on October 14, 1966, awarded Louise counsel fees for $500.00 in the divorce suit although original counsel had requested $2,500.00. The Court was erroneously advised that Louise owned all property with Arthur, as tenants by the entireties, except for a gas station. The erroneous representation made by original counsel was the basis for the reduced counsel fee.

(j) As a direct and proximate result of the false and erroneous advice given by original counsel, Louise "did not prevail in her divorce suit and was deprived of eligibility for alimony insuring support for herself"; she is

receiving a lesser monthly sum of money from Arthur than she received voluntarily from Arthur before original counsel supplied legal advice and assistance; and, she "has never been able to adjust her property rights and her interest in the Jarwood Clinic has been denied."

3. Louise not only has a meritorious defense to Arthur's cross-bill for divorce on the ground of constructive desertion, but she also has ground for a divorce *a vinculo matrimonii* "due to her husband's adultery committed, prior to filing of any litigation between the parties, with a female who became pregnant and sustained a miscarriage thereon, all circumstances to be disclosed at a hearing on the Bill of Review."

4. Louise has been "specially damaged" because of the foregoing in that she was required to institute litigation in regard to her legal and equitable interests in the Jarwood Clinic valued in excess of $200,000; the two motor lodge corporations in which the assets secure a $360,000 mortgage; the Clamber Hill properties valued in excess of $85,000; J. & W., Inc., the property valued in excess of $100,000; and to seek modification of the remaining provisions of the final divorce decree at a legal expense in excess of $3,000 and costs; the payment to original counsel of $2,000 "for his ineffective and incompetent services," the sum of $3,425.00 paid to Louise's counsel secondly employed and $350 to Louise's counsel thirdly employed, all proximately caused by original counsel's conduct of Louise's domestic relations litigation.

5. Although more than 26 months have elapsed next preceding the entry of the final decree of divorce dated October 18, 1966, Louise "has pursued her claims, made in this Bill of Review, diligently and seasonably as by the circumstances following":

(a) Louise first became aware of her original counsel's "improprieties" when his services were terminated shortly after February 3, 1967;

(b) Louise promptly retained counsel to pursue the

matters alleged above on February 14, 1967. Her counsel, secondly employed, was a Baltimore City lawyer who met his death on October 25, 1967, "reportedly of suicide." During this period the attorney, secondly employed, was paid $3,425.00 for "alleged services." Later, Louise discovered that he had converted the entire fee paid to his own personal use and had devoted less than three hours' time to her claims during the eight months' period.

(c) During November of 1967, Louise employed a firm of new counsel in Upper Marlboro. The services of counsel thirdly employed were terminated effective June 19, 1968, upon payment of $350.00. Counsel thirdly employed stated that it was unable to proceed in the matter since one of the partners and original counsel were "personal acquaintances and Directors of the Suburban Trust Company."

(d) Thereupon Louise promptly consulted her present counsel who was formally retained on July 31, 1968.

6. Arthur "has not been disadvantaged by the justifiable delay. Although, the defendant has allegedly remarried in mid-October, 1968, his counsel was advised prior thereto, of the imminence of this proceeding, and the defendant assumed the known risks of his act of remarriage."

The prayers for relief were:

(1) That Arthur file his verified answer in accordance with the Maryland Rules;

(2) That a hearing be held before an advisory jury upon all triable issues in this case;

(3) That, upon conclusion of the hearing, the Court conclude that it has revisory power and control over the provision decreeing a divorce *a vinculo matrimonii* dated October 18, 1966, in Equity No. 1548A;

(4) That "the provision for divorce, described above, be adjudged, ordered and decreed as null, void and of no further effect, with leave to plaintiff to file her amended Bill of Complaint in Equity 1548A; and that the cause

be reinstated for further proceedings consistent therewith"; and

(5) That Louise have other and further relief.

To this Bill for Review, Arthur filed a demurrer on eight specific grounds, citing authorities, as follows:

1. The use of a Bill of Review after the enrollment of a decree is confined to cases where error is apparent on the face of the decree or on the basis of newly discovered evidence; to vacate a decree because of fraud, it must be done upon an original Bill for Fraud.

2. Louise's relief is barred by laches in that notwithstanding that she alleges that she discovered the particular irregularities upon which she now seeks relief in February 1967, she took no steps to attack the decree until November 1968, some 25 months after the entry of the decree; Arthur remarried in October 1968, some two years after the divorce decree and without Louise having taken steps to appeal the decree or otherwise attack its validity. Louise is not excused by the derelictions, procrastination or other shortcomings of her counsel following the decree, it being incumbent upon the parties to know at all times the status of their litigation.

3. The Bill of Review does not allege any fraud on the part of Arthur nor does it allege any conduct on his part that was not before the Court at the time of the issues in Equity No. 1548A. Nor does the bill of review allege that there was any fraud on the part of anyone in the procuring of the decree.

4. The public policy of the State is that adjudications in divorce cases attain unquestionable finality as early as possible after the general control of the Court has passed and Arthur, "having had no participation in the grounds alleged for disturbing this Decree more than two years after the decree became enrolled, should not now be called upon to defend the finality of said Decree."

5. At the most the allegations in the Bill of Review are allegations of the failure of her attorney to charge adultery which amounts to an error of judgment or negli-

gence on his part and is not a recognizable ground for disturbing a decree after enrollment.

6. The allegations of conflict of interest and fraud considered in the light most favorable to Louise nevertheless concern real property matters which have no relevancy to the divorce case. There are no allegations of fraud that purport to have affected the conduct of the plaintiff's case on the issue of desertion and the related issues which are within the purview of the Court in Equity No. 1548A.

7. There are no allegations that Louise had insufficient individual means and property irrespective of the Jarwood Clinic property to justify the Chancellor's limiting her counsel fees to $500.00.

8. In the proceedings in Equity 1548A, the Court had before it Louise's allegation of adultery which, if believed, would have defeated Arthur's right to a divorce based upon Louise's desertion. Having fully resolved the matter in that proceeding, Louise cannot now reopen that issue.

The Chancellor, after a hearing on March 31, 1969, sustained the demurrer without leave to amend, principally on the ground that where there was no fraud upon the jurisdiction of the Court alleged, public policy required that the finality of the decree be maintained, especially after 26 months had elapsed and one of the parties had remarried in the meantime. The Chancellor also stated that the other grounds of demurrer, with their supporting authorities, were relied upon by him in reaching his conclusion. A timely appeal was taken by Louise from the order sustaining the demurrer, without leave to amend. In our opinion, the Chancellor ruled properly and we shall affirm his order.

Maryland Rule 625, "Revisory Power of Court Over Judgment," which is controlling in this case, is as follows:

"a. GENERALLY.
    For a period of thirty days after the entry

of a judgment, or thereafter pursuant to motion filed within such period, the court shall have revisory power and control over such judgment. After the expiration of such period the court shall have revisory power and control over such judgment, only in case of fraud, mistake or irregularity.

"b. NEWLY DISCOVERED EVIDENCE.

The Court may, pursuant to a motion filed within the time set forth in section a of this Rule, grant a new trial or other appropriate relief on the ground of newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under section a of Rule 567 (New Trial)."

Sub-paragraph b was added by the amendment to this rule on July 12, 1965. Sub-paragraph a has been held by us to restate, in substance, the rule at common law in regard to a court's power over a judgment. *Eliason v. Commissioner of Personnel,* 230 Md. 56, 59, 185 A. 2d 390, 392 (1962).

Two principal questions are presented to us:

1. Are the allegations in the bill of review sufficient to indicate that the divorce decree of October 18, 1966, was obtained by "fraud, mistake or irregularity" within the meaning of Rule 625 a?

2. Do the allegations in the bill of review show that Louise is guilty of laches in seeking to set aside the decree?

As we have indicated, Arthur, in his demurrer, also raised the question that a bill of review was not the proper means of raising alleged questions of fraud where no error appears on the face of the decree or no newly discovered evidence is alleged, relying upon our decision in *Pinkston v. Swift,* 231 Md. 346, 351, 190 A. 2d 533, 536 (1963) and prior Maryland cases. This ground of demurrer, however, was not briefed or pressed before

us, so that we consider this issue waived. See Maryland Rule 831 d 2, 4 and *W. R. Grace & Co. v. Comptroller of the Treasury,* 255 Md. 550, 258 A. 2d 740 (1969). Thus, for the purposes of this appeal, we shall treat the bill of review as properly presenting to us the two principal questions involved.

1.

In our opinion, the allegations in the bill of review are not sufficient to indicate that the divorce decree of October 18, 1966, was obtained by "fraud, mistake or irregularity" within the meaning of Rule 625 a as construed by us and our predecessors.

In considering a ruling on demurrer to a bill of review or a bill of complaint "the truth of all material relevant facts properly alleged, together with the inferences which may reasonably be drawn from those facts, is admitted." *Parish v. Maryland & Virginia Milk Producers Ass'n,* 250 Md. 24, 71, 242 A. 2d 512, 538 (1968).

In the bill of review, Louise alleges that she proceeds upon the grounds of "fraud and irregularity" to challenge the decree. In Paragraph 2, she alleges that she has been deprived of the "assistance of counsel * * * constituting such fraud and irregularity" so as to give the Court revisory power and control over the decree. It is well settled that in alleging fraud "particular facts must be stated and no mere allegations of fraud are sufficient." *Jenifer v. Kincaid,* 191 Md. 120, 131, 59 A. 2d 765, 770 (1948). Louise's present counsel was obviously aware of this requirement to allege facts and proceeded in Paragraph 2 after making the general allegations, to allege further that the fraud and irregularity were "due to the malpractice, negligence, conflict of interest and breach of professional ethics" of her original counsel "upon the facts and circumstances following." Then follow 10 separate sub-paragraphs of Paragraph 2 setting out these "facts and circumstances." They have already been given in substance and need not be repeated here. It is sufficient to observe that the principal act of alleged profes-

sional misconduct of the original counsel in regard to the obtention of a divorce *a vinculo matrimonii* on Louise's bill of complaint was in his insistence that her bill be grounded upon constructive desertion rather than upon adultery. In sub-paragraph (h), Louise alleges that this was contrary to her best interest and was based upon certain false and improper considerations, namely, that she would likely obtain alimony in either event, would receive a division of an undivided one-half interest in all jointly held property including the Jarwood Clinic properties in either event, would obtain custody and support of her minor children in either event, would have nothing more to gain in either event but that the *Town of La Plata* had a great deal to lose in the person of Arthur's medical, professional and business stature if Arthur lost his good reputation in the community and finally that Arthur would abscond beyond the Court's jurisdiction "leaving plaintiff without relief or remedy." There is nothing in these facts which indicates or suggests that *Arthur*, himself, had anything to do with the giving of this advice and the preparation of Louise's bill of complaint or that Arthur and Louise's original counsel conspired or colluded in any way. The implication is that Louise's original counsel was of the opinion that a charge of adultery and its proof would be unwise for Louise and for the Town of La Plata, possibly depriving the town of Arthur's professional and other services and Louise of a source of relief or remedy. The other allegations are directed at the negligence of the original counsel in running the title of a particular piece of property and misadvising Louise in regard to various other properties, contrary to her interest, when the original counsel had a position of director, officer or stockholder *in the financial institutions involved.* The most these facts allege is negligence by the original counsel both in regard to the policy to be pursued in preparing Louise's bill of complaint and the presentation of her case, and unprofessional behavior in regard to various property transactions because of a conflict of interest resulting from orig-

inal counsel's positions with the financial institutions involved. The negligence or mistakes of the agents and counsel of the complaining party, are not sufficient to justify a court in striking out an enrolled judgment or decree. In *Tasea Investment Corp. v. Dale*, 222 Md. 474, 160 A. 2d 920 (1960), the moving party in a motion to strike out an enrolled judgment obtained by default alleged that because of the negligence of the movent's insurer in losing the suit papers duly forwarded to the insurer by the movent in ample time for the entry of an appearance and filing of pleas in an automobile property damage case against the movent, no appearance was entered or defense made as a result of which the judgment by default was obtained. The trial court passed an order striking out the judgment. On appeal, we reversed this order. Judge Horney, for the Court, stated:

> "In the cases, the grounds upon which final judgments have been set aside after enrollment are stated to be fraud, deceit, mistake, surprise and irregularity. In the present rule, as consolidated and simplified, the only grounds specified are fraud, mistake and irregularity; deceit and surprise having been eliminated. But in all such cases, the court, in addition to requiring the party who moves to set aside an enrolled judgment to show by satisfactory proof that he is acting in good faith, with ordinary diligence, and that he has a meritorious defense or cause of action, as the case may be, should also require a showing of such facts and circumstances as will certainly establish the fraud, mistake or irregularity allegedly resorted to in obtaining the judgment sought to be vacated."

(citing seven prior decisions of the Court)

\* \* \*

> "In the instant case, it may be that the defendant-appellee acted in good faith and with ordinary diligence, and may have had a merito-

rious defense, but, to reiterate, other than a mere allegation to that effect in the motion to strike, there was absolutely no showing that the vacated judgment had been obtained either by an irregularity or by a mistake. The defendant-appellee, having admitted that she had been duly summoned, none of the reasons assigned in her affidavit was sufficient to constitute such an irregularity as is contemplated by the rule. She did claim, because she had heard nothing further from her insurer, that she believed her interests were being protected. It was her duty, nevertheless, to keep herself informed as to what was occurring in the case. *Baltimore Luggage Co. v. Ligon, III,* 208 Md. 406, 118 A. 2d 665 (1955). She also complained that she had not been notified of the action regarding the entry of the default judgment. Notice to her of subsequent proceedings, however, was definitely not required. Rule 306 b; *Pumphrey v. Grapes,* 215 Md. 573, 138 A. 2d 916 (1958). With respect to the judgment having been obtained by mistake, the only proof afforded by the affidavits, is to the effect that the insurer of the defendant-appellee — the real party in interest — caused the only 'mistake' that was made in this case. Since the judgment against the defendant-appellee was the result of negligence on the part of her insurer, it is certain that such neglect could not and did not justify exercise by the lower court of its *quasi*-equitable power to set aside the judgment. See *Huntington v. Emery,* 74 Md. 67, 21 Atl. 495 (1891)."

(222 Md. at pages 478-480, 160 A. 2d at pages 923-24.)

See also *Pinkston v. Swift,* 231 Md. 346, 190 A. 2d 533 (1963).

In *Pumphrey v. Grapes,* 215 Md. 573, 138 A. 2d 916

(1958) counsel for the appellant failed to protect the client's right to take an appeal after a judgment *n.o.v.* was granted and entered by the trial court, counsel claiming that he did not receive notice of the entry of the judgment *n.o.v.* from the clerk. A few days after the judgment had become enrolled a motion to strike was filed. In affirming the lower court's order declining to strike out the enrolled judgment, Judge (later Chief Judge) Henderson quoted with approval from our prior case of *Baltimore Luggage Co. v. Ligon,* 208 Md. 406, 421, 118 A. 2d 665, 673, as follows:

> " 'It is settled that a party to litigation, over whom the court has obtained jurisdiction, is charged with the duty of keeping aware of what actually occurs in the case and is affected with notice of all subsequent proceedings and that his actual knowledge is immaterial.' "
> (215 Md. at 576, 138 A. 2d at 918.)

Louise relies on *Rucker v. Rucker,* 185 Md. 539, 45 A. 2d 282 (1946) and *Simms v. Simms,* 178 Md. 350, 13 A. 2d 326 (1940), but these cases involved *jurisdictional defects* and are distinguishable from the present case where the jurisdiction of the court was clear. Both parties had resided in Charles County for the required period, had full notice of the divorce proceedings and had tried the case on the merits. *Saltzgaver v. Saltzgaver,* 182 Md. 624, 35 A. 2d 810 (1944), also relied upon by Louise, is distinguishable from the instant case. In the *Saltzgaver* case, the Court held that allegations of mental and physical incapacity to take an appeal from a prior clearly erroneous decision were sufficient to defeat a demurrer to a petition to strike out that prior decree.

### 2.

The allegations of the bill of review, in our opinion, show that Louise is guilty of laches in seeking to set aside the divorce decree. Our decision in *Pryor v. Pryor,*

240 Md. 224, 213 A. 2d 545 (1965), in our opinion, is dispositive of this issue. In *Pryor,* the wife, a non-resident of Maryland, 13 years after the husband had obtained a divorce *a vinculo matrimonii* in Maryland upon an alleged false statement that he had been a resident of Maryland for one year prior to filing his bill of complaint, filed a petition to strike out the decree. The wife alleged that she had not been served with papers contrary to the certificate of foreign service filed in the divorce suit in Maryland. A decree *pro confesso* was obtained, the husband presented testimony, the wife not appearing or being represented by counsel, and the Circuit Court of Baltimore City passed a decree for a divorce *a vinculo matrimonii* on July 16, 1946. The husband remarried one week after the divorce decree was signed. Wife No. 1 obtained actual knowledge in 1946 of the decree of the divorce in Maryland. She filed the petition to strike out the Maryland decree on July 9, 1959, some 13 years after she initially learned about the Maryland divorce decree and some five months after her husband was killed in a railroad accident. Notwithstanding the attack on the Maryland Court's *jurisdiction,* we held that wife No. 1 was barred by laches from maintaining her petition to strike out the Maryland divorce decree. We stated:

> "There is a strong public policy generally in sustaining the finality of judgments and decrees. This policy is of particular importance in regard to decrees divorcing parties *a vinculo matrimonii* as parties are remarried, have children and create new property interests in reliance upon the finality of such decrees. They must not lightly be set aside in view of the injurious consequences which would result to innocent persons. *Leatherbury v. Leatherbury,* 233 Md. 344, 196 A. 2d 883 (1964). As is well stated in 3 NELSON, DIVORCE AND ANNULMENT, § 28.23, page 167 (1945):
>
> > " 'It is essential to the proper functioning

of the courts that their adjudications attain unquestionable finality as early as possible after the period of general control of the court has passed. In view of this, the doctrine of laches is frequently invoked to bar the questioning of a divorce decree after any considerable period of time by one who has knowledge thereof but who failed to act with reasonable promptitude.' "

"In *Croyle v. Croyle, supra,* Judge Melvin, speaking for the Court defined laches as follows:

" 'The very heart of the doctrine of estoppel, through laches, is that the defendant's alleged change of position for the worse must have been induced by, or resulted from, the conduct, misrepresentation or silence of the plaintiff.' (Page 136 of 184 Md.; page 379 of 40 A. 2d)."

(240 Md. at 229-230, 213 A. 2d at 548.)

In the present case, the allegations of the bill of review show on their face that both parties were properly before the Circuit Court for Charles County and a trial on the merits was had. They allege that Louise knew of the passage of the divorce decree on Arthur's cross-bill on October 18, 1966, and discovered the alleged shortcomings of her original counsel at the time of his discharge shortly after February 3, 1967, some two and one-half months after the divorce decree was enrolled. From then until the filing of the bill of review on December 19, 1968, some 26 months after she knew of the decree and some 22 months after she discovered the shortcomings of her original counsel, she delayed in challenging the divorce decree. In the meantime her former husband had remarried and thus changed his position (and doubtless that of his present wife), relying upon the divorce decree. The allegation that counsel for Arthur was notified that Louise intended to file a bill of review challenging the divorce decree shortly before Arthur's second mar-

riage would not, in our opinion, change Arthur's right to rely upon the final decree' which was, of course, valid and binding until stricken out by the court. Cf. *Parker v. Board of Election Supervisors,* 230 Md. 126, 186 A. 2d 195 (1962).

The bill of review does allege various unhappy experiences of Louise with her second and third counsel, but she knew of their inactivity and permitted the time to go by without discharging those counsel and employing counsel who would act promptly. Even after the fourth and present counsel was retained on July 31, 1968, some four and one-half months passed before the bill of review was filed. See *Roberto v. Catino,* 140 Md. 38, 42, 116 A. 873, 875 (1922). In our opinion, Louise is barred by laches appearing on the face of the bill of review from challenging the divorce decree of October 18, 1966.

Our decision to affirm the Chancellor's order in this case does not mean that if Louise is able to prove any negligence or other wrongful conduct on the part of her original counsel, she may not seek .to recover damages against him in another action. Although it does not appear in the record, it was stated by Louise's counsel at the argument that such an action had been filed, lost in in the lower court, and was now on its way to this Court. Inasmuch as there was no allegation that Louise's original counsel was insolvent and unable to pay any judgment which she might obtain against him, it would appear that that action, if ultimately successful, should afford her an opportunity for substantial relief from her alleged loss of alimony and other losses alleged in the bill of review. She had prayed for a divorce *a vinculo matrimonii* in her original bill; this was obtained on Arthur's cross-bill. She sought and received custody of her minor children. The Chancellor in the divorce case had no jurisdiction over the real estate of the parties in any event. The diminished counsel fee for her original counsel would appear to be the subject of a claim in her action against her original counsel. In short, Louise is not left without

the possibility of a substantial remedy by our decision in the present case.

> *Order of March 31, 1969, sustaining the demurrer to the bill of review, affirmed, the appellant to pay the costs.*